Samuel Richard Rubin
FEDERAL PUBLIC DEFENDER
Miles Pope
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho, Ste. 1000
Boise, Idaho 83702
Telephone:   (208) 331-5500
Facsimile:    (208) 331-5525

Attorneys for Defendant
RODOLFO AGUILAR-CHAVEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE DAVID C. NYE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR19-165-S-DCN |
| | ) | |
| Plaintiff, | ) | REPLY IN SUPPORT OF MR. |
| | ) | AGUILAR-CHAVEZ'S MOTION TO |
| vs. | ) | DISMISS |
| | ) | |
| RODOLFO AGUILAR-CHAVEZ | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Court should dismiss count I of the superseding indictment because 1) the government cannot establish that Mr. Aguilar has ever been lawfully removed from the United States and 2) regardless, alternate orders of removal are unlawful.

**A. Mr. Aguilar has never been ordered removed from the United States, so the government cannot meet an essential element of illegal reentry.**

As Mr. Aguilar explained in his motion to dismiss, the government cannot prove an essential element of illegal reentry because Mr. Aguilar has never been ordered removed from the United States (ECF No. 25 at 7-10, 11-12). On December 17, 2002, an IJ granted Mr. Aguilar pre-conclusion voluntary departure (ECF No. 25-

3).[1] Under the terms of this order, Mr. Aguilar was required to depart the United States on or before April 16, 2003 (*id.*). To be sure, the IJ also ordered that if—but only if—Mr. Aguilar failed to timely depart, then an alternate order of removal would immediately come into effect. Because Mr. Aguilar *did* depart the United States prior to April 16, 2003, however, that alternate order never became effective (*see* ECF No. 28-1; 28-2). Consequently, when Mr. Aguilar was physically removed from the United States in summer 2003, he was not removed pursuant to a removal order. Because he had complied with the terms of his grant of voluntary departure, no removal order had ever gone into effect in his case.

The government makes two arguments in response: a factual argument that Mr. Aguilar did not voluntarily depart on time and a legal argument that, no matter whether Mr. Aguilar timely departed the United States, the IJ's 2002 order qualifies as a valid removal order. Both arguments fail.

**1. The government's factual argument fails.**

The government first argues that Mr. Aguilar did timely comply with the terms of the IJ's grant of voluntary departure. In an attempt to prove this, the government introduces two new pieces of evidence: 1) an affidavit prepared by an employee of the Department of Homeland Security who attests she searched for Mr. Aguilar in DHS's TECS system and found no record of his having crossed the border in 2002-2003; and 2) ICE Agent Carol Schindele's unsworn report of a recent interview she conducted

---

[1] At one point, the government expresses some puzzlement over the IJ's grant of voluntary departure could qualify as a grant of pre-conclusion voluntary departure

with the retired border patrol agent who filled out Mr. Aguilar's 2003 I-213, and who reportedly relayed the following information: a) he is not fluent in Spanish; b) "generally speaking" either he or somebody else would have interviewed Mr. Aguilar after they found him in the United States; and c) he had access to Mr. Aguilar's prior I-213 (from 2002) when he prepared the 2003 I-213.

Neither one of these pieces of evidence is persuasive. First, while the government represents in its motion to dismiss that the TECS system contains records "of all individuals who depart the United States on an international flight" (ECF No. 35 at 7), it does not give any evidence to support this proposition. And the publicly available information suggests that this is incorrect. Instead, the publicly available information reflects that the TECS system contains only three subsystems that potentially contain information about passengers on outgoing international flights: 1) the Advanced Passenger Information System (APIS); 2) the Border Crossing System (BCI); and 3) the Non-Immigrant Information System (NIIS).[2] Even setting aside the notorious inaccuracy of DHS databases, *see generally Duncan Roy et al. v. County of Los Angeles et al.*, 12-cv-9012-AB (C.D. Cal.) (materials documenting unreliability of DHS's immigration-related databases), during the time period at issue here—December 2002 through mid-April 2003—it appears that none of these systems purported to systematically collect information on all passengers departing the United States on an international flight. APIS did not systematically

---

[2] *See* DHS, Privacy Impact Statement, TECS System: Platform (Aug. 12, 2016), *available at* https://www.dhs.gov/sites/default/files/publications/DHS-PIA-ALL-021%20TECS%20System%20Platform.pdf

collect information on passengers departing the U.S. on an international flight until approximately 2005, when the rule requiring the submission of passenger-manifests for departing flights became final. *See* 70 FR 17855 (Apr. 7, 2005), as amended by 72 FR 48344 (Aug. 23, 2007), codified at 19 C.F.R. § 122.75a(1)(i). Any information contained in BCI on passengers departing the U.S. on an international flight would have been culled either from APIS or from other programs (such as the Global Enrollment System) that were not in operation during 2002-2003. *See, e.g.*, Notice of Privacy Act System of Records, Department of Homeland Security U.S. Customs and Border Protection-007 Border Crossing Information System of Records, 81 FR 4040-01, at 4040, 4041 (Jan. 25, 2016). And the NIIS subsystem contains largely the same information as the BCI subsystem, with the addition of information documenting each time a departing alien submits a Form I-94. But because CBP did not systematically collect Form I-94s from all departing aliens in 2002-2003, it is no surprise that the NIIS subsystem does not contain information documenting Mr. Aguilar's departure in 2003, either. The government's search of the TECS database provides no evidence that Mr. Aguilar failed to timely depart.

Nor does the government's other piece of evidence—Agent Schindele's unsworn report of her interview with the retired agent (Claude Jackson) who prepared Mr. Aguilar's 2003 I-213—establish that Mr. Aguilar failed to depart pursuant to the terms of the voluntary-departure order (Gov. Ex. 6). The government argues that this report is evidence that Mr. Aguilar admitted, in 2003, that his last date of entry into the United States was in 1999 (ECF No. 35 at 5-6). If anything, however, the opposite

is true—this report *bolsters* the conclusion that Mr. Aguilar was not asked about when he last entered the United States in 2003. The report contains the following information supporting the inference that when CBP conducted the 2003 "Bag and Baggage" of Mr. Aguilar, they did not ask him about his last date of entry:

***First***, Agent Jackson told Agent Schindele that "generally speaking" he would interview an alien in the course of preparing an I-213 (although "sometimes other Border Patrol Agents would help out with interviewing)";

***Second***, Agent Jackson told Agent Schindele that he is not fluent in Spanish, and that, even at the time he was working, he preferred to rely on other agents in communicating with aliens because they were "good Spanish speaker[s]";

***Third***, Agent Jackson had the ability to draw on Mr. Aguilar's prior I-213 in preparing the 2003 I-213. And that appears to be exactly what he did. This is the first paragraph of the July 2002 I-213:

> Subject, AGUILAR, is a citizen and resident of Mexico and has never been a citizen or legal resident of any country other than Mexico. AGUILAR's last entry into the United States is described above. AGUILAR states that he paid an unknown smuggler $1500.00 to smuggle him across the border and then transport him to Idaho. AGUILAR has been residing at the above listed U.S. address with his brother.

And this is the first paragraph of the July 2003 I-213:

> Record of Deportable/Excludable Alien:
> Subject, AGUILAR, is a citizen and resident of Mexico and has never been a citizen or legal resident of any country other than Mexico. AGUILAR's last entry into the United States is described above. AGUILAR states that he paid an unknown smuggler $1500.00 to smuggle him across the border and then transport him to Idaho. AGUILAR has been residing at the above listed U.S. address with his brother.

Particularly given 1) that nowhere does the 2003 I-213 reflect that Agent Jackson asked Mr. Aguilar about whether he had complied with the terms of the voluntary departure order and 2) that a warrant of deportation had already been

issued at the time Mr. Aguilar came into ICE custody, there is every reason to think that this "bag and baggage" did not involve an interview of Mr. Aguilar to get updated information on the circumstances of his having been found in the United States.

The government's factual argument that Mr. Aguilar failed to comply with the terms of the voluntary-departure order is unpersuasive.

### 2. The government's legal argument fails.

The government next appears to argue that—regardless of whether Mr. Aguilar complied with the IJ's voluntary departure order—the border patrol lawfully removed Mr. Aguilar in 2003 because its "brief investigation" of Mr. Aguilar unearthed no evidence that he had voluntarily departed in 2002 (ECF No. 35 at 12-13).

This is incorrect. Instead, whether the border patrol lawfully removed Mr. Aguilar in 2003 depends on whether a final order of removal was in effect at that time. *See* 8 C.F.R. § 241.2(a) (a warrant of removal must be based on a "final administrative removal order"). If there was no final order of removal in effect at the time Mr. Aguilar was physically removed, then his removal was unlawful, and it therefore cannot sustain an illegal reentry prosecution. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1079 (9th Cir. 2011) ("To convict an alien criminal defendant of illegal reentry under 8 U.S.C. § 1326, the government must prove that the alien left the United States under ***order*** of exclusion, deportation, or removal, and then illegally reentered" (emphasis added)). And because there was only a removal order in effect if Mr. Aguilar did not timely voluntarily depart, the

government can sustain an illegal reentry prosecution ***only if*** Mr. Aguilar did not comply with the terms of his voluntary departure—a conclusion that it did not come close to establishing in 2003 (*see generally* ECF No. 25 at 7-11 (documenting due process problems with border patrol agents' decision to physically remove Mr. Aguilar without assuring themselves that a valid order of removal existed in his case). The government's independent legal argument accordingly fails.

**B. Alternate orders of removal are unlawful.**

In his motion to dismiss, Mr. Aguilar argued that alternate orders of removal are unlawful because they violate both the Immigration and Nationality Act and the Due Process Clause. They violate the INA because the INA only authorizes grants of voluntary departure "in lieu of" removal (or "*prior* to the completion of [removal] proceedings")—not an order that grants both at once (ECF No. 25 at 10). *See* 8 U.S.C. § 1229c(a)(1). And they violate the Due Process Clause because alternate orders of removal enable the *automatic* removal of an alien who is not under a grant of voluntary departure, without any notice or opportunity for a hearing (ECF No. 25 at 10-11).

The government's arguments to the contrary are unpersuasive. With respect to whether the regulation authorizing alternate orders of removal is statutorily ultra vires, the government urges the Court to apply "deference" to that regulation (ECF No. 35 at 10). This is too hasty; a court should not "resort to *Chevron* deference" where "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018). And in the context of

alternate orders of removal, Congress has spoken clearly: an IJ may only grant voluntary departure "in lieu of" removal proceedings or "prior to the completion" of removal proceedings. 8 U.S.C. § 1229c(a)(1). "In lieu of" means "in the place of; instead of." *lieu* Miriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/lieu; *see also United States v. Elias*, 2000 WL 489732, at *1 (D. Idaho 2000) (Winmill, J.) ("The plain meaning of the phrase 'in lieu of' as used in [EPA's hazardous waste regulations] is that approved state hazardous waste laws **supplant** their [federal] counterparts."). And "prior to the completion of" removal proceedings means **before** a removal order is entered. *prior to* Miriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/prior ("prior to" means "in advance of : before").

The regulation purporting to authorize "alternate order[s] of removal in connection with a grant of voluntary departure" is inconsistent with the plain language of the statute authorizing voluntary departure. 8 C.F.R. § 1241.1(f). If voluntary departure may only be granted 1) instead of removal proceedings or 2) prior to the completion of those proceedings, then an IJ may not grant voluntary departure *alongside* or (as the regulation puts it) "in connection with" an order of removal. The plain meaning of the INA prohibits alternate orders of removal.[3]

---

[3] *Garfias-Rodriguez v. Holder*, 702 F.3d 504 (9th Cir. 2012) (en banc), is not to the contrary. That case held that the regulation allowing the Attorney General to terminate a grant of voluntary departure if an alien files a petition for review is consistent with the INA's provision that "[t]he Attorney General *may* permit an alien voluntarily to depart the United States at the alien's own expense if . . . the immigration judge enters an order granting voluntary departure in lieu of removal." *Id.* at 525 (quoting 8 U.S.C. § 1229c(b)(1)) (emphasis in original). *Garfias-Rodriguez*,

The government's argument why alternate orders of removal comport with the Due Process Clause fares no better. The government concedes that the immigration regulations do not contemplate giving an alien who has complied with a grant of voluntary departure but later returned to the United States any notice or process at all before physically removing them (ECF No. 35 at 12).[4] But the government says this is no problem because, during Mr. Aguilar's 2002 hearing—when he was granted voluntary departure—he had been "found removable" (ECF No. 35 at 13). The suggestion appears to be that whether or not a person complied with a grant of voluntary departure—and thus whether or not he become subject to a removal order—is just a trifling technicality as long as the person was "found removable." If

---

however, dealt with the permissive portion of the INA, the portion giving the Attorney General discretion. By contrast, alternate orders of removal run afoul of the portion of the INA that *cabins* the immigration authorities' discretion, by requiring them to *choose* between a carefully delineated set of alternatives: removal, voluntary departure in lieu of removal proceedings, or voluntary departure prior to the completion of removal proceedings.

And this situation is covered, not by *Garfias-Rodriguez*, but by *Ocampo v. Holder*, 629 F.3d 923 (9th Cir. 2010). *Ocampo* explains that a regulation which "effectively amend[s] [the INA] to afford an additional circumstance when removal orders become final that is not expressed in the statute" cannot stand because it contravenes unambiguous statutory language. *Id.* at 927. That is precisely what the regulation authorizing alternate orders of removal does: it purports to "afford an additional circumstance" in which an IJ can issue a removal order—namely, it purports to provide that an IJ can order removal *along with* granting voluntary departure, even though the statute sets forth a stark binary choice between the voluntary-departure track and the removal-proceeding track. Alternate orders of removal are unlawful.

[4] At one point the government suggests that "[a] new hearing in the face of doubt about departure appears to have been the agency's practice back in 2003" (ECF No. 35 at 12). But there is little evidence to support that; indeed, the record in this case suggests that a warrant of deportation was issued against Mr. Aguilar before any investigation into whether he departed was conducted at all.

a person is granted voluntary departure, *complies* with voluntary departure, and is then later found in the United States, it is fine to simply summarily deport him and wish into existence a removal order that was never actually entered.

This is wrong. The entry of a removal order carries with it massive consequences in terms of 1) when a person can reenter the United States and 2) what criminal liability attaches to such a reentry. A procedure that—without any process at all—automatically converts a grant of voluntary departure into an order of removal, all *in defiance of the terms of the grant of voluntary departure itself*, cannot comport with the Due Process Clause. Indeed, the Ninth Circuit has found that reinstatements of actual removal orders—a far more ministerial task than determining whether an alternate order of removal has converted from a grant of voluntary departure into an order of removal—are constitutional only because they require immigration officers to give an alien notice and a hearing before reinstating removal. *See Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 496 (9th Cir. 2007) (upholding the reinstatement-of-removal scheme in light of "the procedure safeguards provided by 8 C.F.R. § 241.8" including the requirement that immigration officers "provide notice" and "permit[] the alien to make a written or oral statement").

## C. Prejudice

Finally, the government claims that no prejudice flows from Mr. Aguilar's having been removed in the absence of a valid order of removal. The Ninth Circuit disagrees. *See, e.g.*, *United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006) (When an individual is "removed when he [legally] should not have been, [he] clearly

suffer[s] prejudice."). And, in any event, as Mr. Aguilar pointed out in his motion to dismiss: if there is no lawful removal order in effect in this case, then Mr. Aguilar cannot be prosecuted for illegal reentry because an essential element simply does not exist.

**Conclusion**

For the reasons stated here and in Mr. Aguilar's opening motion, count I of the indictment must be dismissed.

Dated: December 6, 2019          SAMUEL RICHARD RUBIN
                                                     FEDERAL PUBLIC DEFENDER
                                                     By:


                                                     /s/ Miles Pope
                                                     Miles Pope
                                                     /s/ Nicole Owens
                                                     Nicole Owens
                                                     Federal Defender Services of Idaho
                                                     Attorneys for Defendant
                                                     RODOLFO AGUILAR-CHAVEZ

# CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing document was served on all parties named below on this 6th day of December, 2019.

| | |
|---|---|
| Kassandra McGrady, Assistant United States Attorney | |
| Sean Mazorol, Assistant United States Attorney | |
| Office of the United States Attorney | ____United States Mail |
| Washington Group Plaza, IV | ____Hand Delivery |
| 800 Park Blvd, Suite 600 | ____Facsimile Transmission |
| Boise, ID 83712 | _X_ CM/ECF Filing |
| (208) 334-1211 | ____Email Transmission |
| (208) 334-1413 – Facsimile | |
| Kassandra.McGrady@usdoj.gov | |

Dated: December 6, 2019        /s/ Miles Pope
                               Miles Pope