Samuel Richard Rubin
FEDERAL PUBLIC DEFENDER
Miles Pope
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho, Ste. 1000
Boise, Idaho 83702
Telephone: (208) 331-5500
Facsimile: (208) 331-5525

Attorneys for Defendant
RODOLFO AGUILAR-CHAVEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE DAVID C. NYE)

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. RODOLFO AGUILAR-CHAVEZ Defendant. | CR19-165-S-DCN **Response to Government's Motion to Introduce 404(b) Evidence** |

## Introduction

The government has given notice that it intends to introduce evidence of four alleged prior bad acts at Mr. Aguilar's trial. The government wants to introduce evidence that Mr. Aguilar has had contact with policemen on various occasions—June 21, 2002; on July 25, 2003; and on April 22, 2019. It also wants

to introduce evidence that Mr. Aguilar falsely attested to having been a lawful permanent resident in the United States on a form I-9 in 2006.

This Court should exclude all of this evidence. The government's claim that evidence of Mr. Aguilar's police contacts is admissible because those contacts are "inextricably intertwined" with the illegal reentry charge in this case is meritless, as is the government's contention that the alleged false attestation in 2006 is admissible under Federal Rule of Evidence 404(b).

**Background**

Mr. Aguilar has been in the United States since he was a juvenile. He has a loving family whom he supports here. And his overarching goal is to find some pathway to be able to continue contributing to this country and providing for his family.

On May 14, 2019, the government charged Mr. Aguilar with one count of illegal reentry (ECF No. 1). After Mr. Aguilar identified a plausible defense to this charge—and, in consultation with counsel, decided to defend against it in the hopes of leveraging that defense into potential immigration relief—the government filed a superseding indictment, charging Mr. Aguilar with both illegal reentry (as charged in the original indictment) and having made a false attestation on an I-9 form, so that he could work (ECF No. 19).

Mr. Aguilar has now filed a motion to dismiss the illegal reentry count, a motion to sever that count from the false attestation count, and a motion to

exclude various statements law enforcement obtained from him in violation of his *Miranda* rights (ECF No. 25, 26, 27).

The government, for its part, asks the Court to allow it to introduce various other acts allegedly committed by Mr. Aguilar—but unnecessary to prosecuting the actual charges he faces. In particular, the government seeks to introduce evidence that Mr. Aguilar has had police contacts at three separate occasions in the past, and that, on one of those occasions, he used an alias (ECF No. 43 at 2, 11-15). Additionally, attempting to circumvent the applicable statute of limitations,[1] the government seeks to introduce evidence that Mr. Aguilar made a false attestation on a form I-9 in 2006—contending that this evidence is admissible under rule 404(b) of the Federal Rules of Evidence (ECF No. 43 at 2, 8-11).

For the reasons stated below, the government must not be allowed to introduce this evidence. It serves no valid purpose, and, even if it did, its prejudicial effect and the risk of confusion it carries with it substantially outweighs whatever probative value it might possess.

## Argument

### A. The evidence related to Mr. Aguilar's police contacts is inadmissible.

Claiming that it is "inextricably intertwined" with the illegal reentry

[1] *See* 18 U.S.C. § 3282.

charge, the government seeks to introduce evidence of Mr. Aguilar's contacts with police on three separate occasions: 1) June 21, 2002 (when he allegedly told Jerome policeman that his name was "Roberto Villa-Gomez"); 2) July 25, 2003 (when he had contact with Gooding County police); and 3) April 22, 2019 (the police contact that led to his arrest in this case).

It is obvious that a defendant's contacts with the police has the potential to inflame the jury or cause them to impermissibly speculate about whether the defendant has committed other crimes. It is less obvious how contact with the police has anything to do with the elements of illegal reentry. Evidence of police contact is unnecessary to establish any of that crime's elements. Police contact has nothing to do with a person's alienage. It has nothing to do with whether a person has been removed in the past. It has nothing to do with whether they had permission to be in the United States when they were found here. And it is unnecessary to establish that they were found in the United States following a removal.

The government says otherwise, adducing shifting rationales for each police contact evidence of which it wants to introduce. It says the police contact on June 21, 2002 needs to be introduced "in order to explain to the jury how immigration officials learned of the Defendant's unlawful presence in the country" (ECF No. 43 at 11). The July 25, 2003 contact is supposed to be necessary "to explain how immigration officials became aware that the

Defendant was in the United States after the voluntary departure deadline and why they sought a warrant of removal" (ECF No. 43 at 13). And the April 22, 2019 contact is necessary to "explain how, and where, immigration officials located the Defendant," to explain "fingerprint evidence" the government plans to introduce, to explain how the government obtained a "Mexican Consulate" card that it supposedly obtained, and, generally, "to accurate portray the events as they occurred" (ECF No. 43 at 14-15). These rationales, the government contends, establish that each of these police contacts is "inextricably intertwined" with the illegal reentry allegations.

The government is wrong. The "inextricable intertwinement" doctrine is a disfavored mechanism by which the government can introduce other-acts evidence without satisfying the prerequisites of rule 404(b). It permits the introduction of other-acts evidence only if those acts 1) "constitute a part of the transaction that serves as the basis for the criminal charge" or 2) are "*necessary* . . . in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Loftis*, 843 F.3d 1173 (9th Cir. 2016) (emphasis added).

The Ninth Circuit has cautioned that the inextricable intertwinement doctrine "should be applied narrowly." *United States v. Hill*, 953 F.2d 452, 457 n.1 (9th Cir. 1991). This is because the doctrine is too easily used as an end-run around the Federal Rules of Evidence. As the Seventh Circuit has

explained, "[i]f evidence is not direct evidence of the crime itself, it is usually propensity evidence simply disguised as inextricable intertwinement evidence, and is therefore improper[.]" *United States v. Gorman*, 613 F.3d 711, 718-19 (7th Cir. 2010).

Here, none of the police contacts the government seeks to introduce—or the evidence related to them—satisfies the inextricable-intertwinement doctrine. Those contacts plainly do not "constitute a part of the transaction that serves as the basis for the [illegal reentry] charge," as the crime of illegal reentry simply does not encompass police contacts of any sort. *Loftis*, 843 F.3d at 1178. The government does not contend otherwise.

Nor is it "necessary" for the government to introduce evidence of these police contacts to "offer a coherent and comprehensible story regarding the commission of the crime." *Id.* The government says it needs to introduce evidence of Mr. Aguilar's police contact in 2002 to explain how immigration officials first learned he was in the country. But this is not any part of the crime of illegal reentry nor is it essential to an illegal reentry narrative. To explain how Mr. Aguilar was first located in the United States, the government need only introduce evidence that, during the course of an immigration-related investigation, immigration authorities located Mr. Aguilar in the District of Idaho. This is a perfectly coherent and comprehensible narrative.

Nor does the government need to introduce evidence of Mr. Aguilar's contact with the police in 2003. The government says this evidence is necessary "to explain how immigration officials became aware that the Defendant was in the United States after the voluntary departure deadline and why they sought a warrant of removal" (ECF No. 43 at 13). But the government doesn't need to explain this. For purposes of proving the crime of illegal reentry, all that matters is that Mr. Aguilar was physically removed from the U.S. "[T]he reasons for [a person's] deportation are not *necessary* to completing the story of the crime with which he is charged: illegal reentry." *United States v. Simpson*, 929 F. Supp. 2d 177, 199 (E.D.N.Y. 2013). Why Mr. Aguilar was removed, and how he was found, are simply irrelevant. The coherent narrative of an illegal reentry trial is told by the removal-related documents—not extraneous police reports.

Finally, the government should not be allowed to introduce evidence of Mr. Aguilar's police contact in 2019. The government says this contact is necessary to explain how immigration authorities located Mr. Aguilar in the United States, how they came into possession of Mr. Aguilar's Mexican Consulate card, and how they acquired fingerprints of Mr. Aguilar. But the government can tell a perfectly coherent story about all of this—to the extent it is admissible—without mentioning an antecedent arrest by the Jerome police. Just like with any evidence of how the government originally located

Mr. Aguilar in the United States, the government can simply elicit testimony that immigration officials encountered Mr. Aguilar during an immigration investigation and that they obtained the fingerprint and consulate card evidence—to the extent it is admissible—in the routine course of that investigation.

The government should be precluded from introducing Mr. Aguilar's police contacts under the guise of inextricable intertwinement. Notably, that evidence would also inflame the passions of the jury, which could not help but speculate that Mr. Aguilar is an inveterate criminal—and could not help but convict him based on evidence that he provided an alias to the police—based on the evidence the government seeks to introduce. *See* Fed. R. Evid. 403.

**B. The evidence related to Mr. Aguilar's alleged 2006 false attestation on a form I-9 is also inadmissible.**

The government also seeks to introduce evidence that Mr. Aguilar made a false attestation on a form I-9 in 2006, claiming that, under rule 404(b) of the Federal Rules of Evidence, this evidence is admissible in its case-in-chief "to prove knowledge, intent, and absence of mistake or accident" (ECF No. 43 at 8). The government is wrong.

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with

[that] character." This rule "reflects the revered and longstanding policy that, under our system of justice, an accused is tried for *what* he did, not *who* he is." *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014); *see United States v. Derington*, 229 F.3d 1243, 1247 (9th Cir. 2000); *see also Michelson v. United States*, 335 U.S. 469, 475–76 (1948) (rule 404(b) helps ensure government cannot prejudice jury by presenting evidence that a defendant is somehow a "bad person"). Rule 404(b) embodies the general understanding that "prior offense evidence is generally more prejudicial than probative." And it thus imposes on the government a "burden to explain each proper purpose for which it seeks to introduce the evidence, to present a propensity-free chain of inferences supporting each purpose, and to establish that such evidence is relevant, necessary, reliable, and not unduly prejudicial." *United States v. Hall*, 858 F.3d 254, 277 (4th Cir. 2017). Crucially, as the government concedes, evidence of other acts is not admissible if those acts are "too remote in time." *United States v. Bracy*, 67 F.3d 1421, 1432 (9th Cir. 1995).

Under this framework, the government cannot carry its burden to show that allegations regarding a 2006 false attestation on an I-9 are admissible. ***First***, boiled down, the government's request to introduce this evidence is ultimately just an attempt to prove that Mr. Aguilar committed the crime charged in count II in the past, so he likely did it again. This is mere propensity evidence and is therefore inadmissible.

***Second***, admitting the allegations regarding Mr. Aguilar's false attestation in 2006 are would be unduly prejudicial and create an unacceptable risk of confusing the jury. Allowing the government to introduce evidence of the 2006 alleged false attestation would wreak havoc on this trial. Admitting that evidence would transform this trial into a trial on not one allegation of a false attestation, but two. If the government can introduce evidence that Mr. Aguilar made a false attestation in 2006, then Mr. Aguilar would have to be able to mount a defense to these allegations. He would need to be able to put on evidence concerning *whether* he made the false attestation, whether he *knew* he was making a false statement on a federal employment document on that occasion, what his employer in 2006 told him about the form, and a host of other issues related to the 2006 allegations. This would create an unacceptable risk of jury confusion and undue prejudice.

***Third***, the evidence the government seeks to admit is too remote in time to be admissible. Indeed, the government's attempt to introduce allegations from 2006 is nothing more than an effort to make an end-run around the statute of limitations. Congress crafts its statutes of limitations with a careful eye toward ensuring that a defendant will not be prejudiced by being tried at a time when memories have faded and the precise facts and circumstances surrounding a charge have been lost to memory. *See Toussie v. United States*, 397 U.S. 112, 114-15 (1970) (point of statute of limitations is "to protect

individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time"). Permitting the government to introduce evidence that Mr. Aguilar made a false attestation on a form I-9 in 2006 will place him in the untenable position of having to defend against allegations of long-past fraud. The defenses to this fraud all relate to what Mr. Aguilar was told, whether documents were properly translated for him, and other factual questions that do not exist anywhere on a cold, written record. Admitting the evidence from 2006 that the government seeks to introduce will thus unduly prejudice the jury and hamstring Mr. Aguilar's ability to present a defense.

Under both rule 404(b) and rule 403, this evidence must be excluded.

## Conclusion

For the reasons stated here, Mr. Aguilar respectfully asks the Court to exclude the other acts evidence that the government has given notice it intends to introduce.

Dated: January 15, 2020

SAMUEL RICHARD RUBIN
FEDERAL PUBLIC DEFENDER
By:

/s/ Nicole Owens
Nicole Owens
/s/ Miles Pope
Miles Pope
Federal Defender Services of Idaho
Attorneys for Defendant
RODOLFO AGUILAR-CHAVEZ

CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing document was served on all parties to the case via the CM/ECF Filing system.

Dated: January 15, 2020

/s/ Miles Pope
Miles Pope